**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**JERAMY SCOTT DICKERSON,**

      **Plaintiff,**

                                    **Civil Action 2:16-cv-367**

**vs.**                                  **Judge Algenon L. Marbley**
                                      **Chief Magistrate Judge Elizabeth P. Deavers**

**COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**

## OPINION AND ORDER

Plaintiff, Jeramy Scott Dickerson, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his applications for social security disability insurance benefits and supplemental security income.  This matter is before the Court on Plaintiff's Statement of Errors (ECF No. 7), the Commissioner's Memorandum in Opposition (ECF No. 8), and the administrative record (ECF No. 6).  For the reasons that follow, the Court **OVERRULES** Plaintiff's Statement of Errors and **AFFIRMS** the Commissioner's decision.

## I.     BACKGROUND

In January 2011, Plaintiff filed applications for both supplemental security income and disability insurance benefits.  (R. at 339–47.)  Plaintiff maintains that he became disabled on January 1, 2009, as a result of a back injury, knee pain, schizoaffective disorder, anti-social behavior, bipolar disorder and "other mental problems" and anxiety.  (R. at 379.)  Plaintiff's applications were denied initially and upon reconsideration. Plaintiff attended an initial hearing

before an administrative law judge ("ALJ") in 2012, followed by denial of his claims on January 16, 2013 .  (R. at 217–40.)

Plaintiff challenged the ALJ's decision and the Appeals Council granted review and vacated the ALJ's January 16, 2013 decision.   Following remand by the Appeals Council on April 16, 2014, Plaintiff appeared and testified at the October 15, 2014 hearing, represented by counsel.  (R. at 62–94.)  A vocational expert also appeared and testified at the hearing.  (R. at 95–117.)  On November 25, 2014, ALJ Ryan Glaze issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 20-43.)  On December 18, 2014, Plaintiff filed a Request for Review of Hearing Decision Order.  (R. at 16.)  On February 24, 2016, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision.  (R. at 1–6.)  Plaintiff then timely commenced the instant action.

## II.    HEARING TESTIMONY[1]

### A.    Plaintiff's Testimony

#### 1.    First administrative hearing

Plaintiff testified at the first administrative hearing on December 13, 2012, that he has four minor children and is separated from his wife.  (R. at 124.)  He has lived with his parents for the last four and a half or five years.  (R. at 124–25.)  He obtained his GED in 2005 or 2006.  (R. at 125.)  Plaintiff stated that he "did go to college for heavy equipment operation," but that he did not last very long because there were "too many people there and I couldn't stand being around

---

[1] The Court limits its analysis of the evidence and the administrative decision to the issues raised in the SOE.

it." (*Id*.)  Plaintiff testified that he has never obtained a driver's license because he never really liked to drive as it makes him nervous and he's afraid he will kill someone in the car.  (R. at 125–26.)

Plaintiff last worked as a box attendant, putting boxes together and pulling skids.  (R. at 126.)  He was fired from that job because there were "too many people around and I just flipped out one day and went off" on a manager.  (R. at 128.)

Plaintiff testified that he has had anger issues and angry outbursts for years since he was fifteen or sixteen years old and he experiences them a few times a month.  (R. at 143, 146, 155, 158.)  If something upsets him, like hearing his parents argue or seeing a person he does not like, Plaintiff will go into a rage and "almost black out" and he will "want to go and attack them."  (R. at 144.)  He explained that he has "blacked out" and "did not know" at the time that he beat someone and put them in the hospital.  (R. at 156.)  During these outbursts, he will scream and "beat the hell out of something" and has broken coffee tables and chairs and has broken doors off of hinges and put his head and foot through a wall.  (R. at 158.)  According to Plaintiff, he has had "many fights, but I was never in jail for them."  (R. at 144.)  He has one domestic violence charge against his wife from 2007 or 2008.  (*Id*.)  In addition to spending three days in jail and community service, Plaintiff attended an anger management class, which was "just a joke."  (R. at 145.)  Plaintiff testified that the outbursts have "calmed down some" since he started taking medication, but he still hears voices, which puts him in an angry mood.  (R. at 146.)  The voices tell him to kill himself and hurt people and animals.  (*Id*.)

Plaintiff stated that he is depressed quite often.  (R. at 148.)  When asked what symptoms from depression he experiences, Plaintiff testified that he does not want to be around or talk to

people and wants to be by himself.  (R. at 149.)  Sometimes he will cry or become angry and

start punching doors or a wall.  (*Id*.)  His depression can last one day or sometimes two or three

days.  (*Id*.)

Plaintiff testified that he suffers from panic attacks, explaining that he will start shaking if

he is around four or five people because he feels like they are laughing at him and staring at him.

(R. at 149.)  Even around a lot of family members, he feels the same way.  (*Id*.)  Plaintiff stated

that he does not go shopping or go to public places, including grocery shopping and clothes

shopping.  (R. at 149, 154.)  Plaintiff's mother grocery shops and he shops online for diapers and

other things for the children.  (R. at 154.)

Plaintiff stated that he is seeing a counselor and has a psychiatrist, Dr. Wheaton Wood.

(R. at 150–51.)  Plaintiff testified that the counseling gets a weight off of his chest.  (R. at 157.)

Plaintiff takes medication, but it has not calmed him down enough to where he feels "safe to be

out in public."  (*Id*.)

Plaintiff sees his children every morning.  (R. at 152.)  He is responsible for caring for his

youngest daughter (two years old at the time of the hearing) from approximately 7:30 a.m. until

about 4:00 p.m.  (*Id*.)  He makes her breakfast, lunch, and dinner, changes her diapers, and

bathes her.  (*Id*.)  He explained that he feels "more mellow" and happier when his kids are

around and it helps him to be around them and to play with them.  (R. at 152–53.)

Plaintiff helps his parents with the housework and does some basic cooking.  (R. at 153.)

He also does his own laundry.  (R. at 154.)  Plaintiff has a couple of friends whom he sees every

two or three weeks.  (*Id*.)

### 2. Second administrative hearing

Plaintiff testified at the second administrative hearing on October 15, 2014, that he lives with his parents. (R. at 62.) He is divorced and sees his children every other weekend. (R. at 64, 77-78.) He believes he got divorced due to "this issue with my head." (R. at 64.) The only thing that makes him happy is spending time with his girls. (R. at 88.)

Plaintiff stated that he cannot tolerate being around a lot of people. (R. at 69, 87.)

Plaintiff testified that he experiences depression every day. (R. at 81.) He stated that he experiences suicidal ideation, but he would never act on his thoughts due to his concerns over the well-being of his daughters. (R. at 86.) He has difficulty being around people. (R. at 69, 87.) He had many verbal altercations with supervisors in the past. (R. at 91.) Plaintiff has anger outbursts and being irritable. (R. at 87–88.) At the time of the hearing, he was receiving treatment, but he continued to experience hallucinations and "morbid dreams." (R. at 78–80.)

He tries to perform some household work such as sweeping floors or cleaning the dishes. (R. at 63, 76–77, 84.) He spends most of his time watching television. (R. at 76.) He does not drive because it makes him nervous and he does not trust himself. (R. at 64–65.)

Plaintiff testified that he takes medication, which makes him feel sleepy but does not "really do everything it's supposed to do." (R. at 79.) Plaintiff stated that there was no medication that was going to fix what is wrong with his brain. (*Id*.)

When asked whether social media reflected that he had recently attended some concerts in Columbus, Plaintiff stated that he has not been to a concert since 2006–2007. (R. at 92–93.)

**B.     Vocational Expert Testimony**

George Coleman III testified as a vocational expert ("VE") at the second administrative hearing[2] on October 15, 2014.  (R. at 95–117.)  The VE testified that Plaintiff's past jobs include construction work, a heavy exertion, semi-skilled job; a furnace installer/pipe fitter helper, a heavy exertion, semi-skilled job; and a material handler, a heavy exertion (performed at light), semi-skilled job.  (R. at 96–98.)

The ALJ proposed a series of hypotheticals regarding Plaintiff's residual functional capacity ("RFC") to the VE.  (R. at 99–107.)  Based on Plaintiff's age, education, and work experience and the RFC ultimately determined by the ALJ, the VE testified that Plaintiff could not perform his past relevant work, but could perform approximately 65,000 unskilled, light and sedentary exertional jobs in the national economy such as a cutter/paster, addresser/clerk, and document preparer.  (R. at 108–09.)  The VE also testified that the hypothetical individual would have to be around 5 to 30 coworkers depending on the size of the workstation or room.  (R. at 110.)  The VE stated that if an individual required a work environment with complete social isolation from others, defined as performance of the essential function of the job without anyone in the proximity of the work station, "that would be seen as an accommodation with an undue burden on the employer."  (R. at 114–15.)  Finally, the VE stated that if the hypothetical individual were off task 10 minutes of each hour, he would be unable to perform the essential functions of a job.  (R. at 117.)

---

[2]Because Plaintiff limits his discussion to the VE's testimony at the second administrative hearing, the Court does not set forth the VE's testimony at the first administrative hearing.

### III.  MEDICAL RECORDS[3]

**A.  Jeffrey Haggenjos, D.O.**

The record contains clinical notes from primary care physician, Dr. Haggenjos from December 1999 through December 2013.[4]  (R. at 520–44, 687–729, 831–32, 1037–42, 1100–04, 1250–51.)  Dr. Haggenjos first diagnosed Plaintiff with bi-polar disorder in 2010.  For instance, on August 25, 2010, Plaintiff reported his medication for bipolar disorder was not working.  This occurred four days after his counselor from Six County sent a letter regarding changing his medication.  (R. at 536.)  On September 22, 2010, Plaintiff stated that he continued to be depressed and angry and he could not sleep.  He diagnosed insomnia and anxiety and adjusted Plaintiff's psychotropic medication.  (R. at 535.)

During the course of his treatment of Plaintiff, Dr. Haggenjos submitted four assessments as to Plaintiff's mental health.  In February 2011, Dr. Haggenjos opined that Plaintiff was "currently unable to work."  (R. at 532.)

Dr. Haggenjos completed a Mental Residual Functional Capacity Questionnaire on August 21, 2012.  (R. at 772–75.)  He found Plaintiff had extreme limitations in the ability to respond appropriately to co-workers or peers; relate to the general public and maintain socially appropriate behavior; perform and complete work tasks in a normal workday or week at a consistent pace; work in cooperation with or in proximity to others without being distracted by them; maintain attention and concentration for more than brief periods of time; perform at

---

[3]As noted earlier, the Court limits its discussions to issues raised in the SOE, *i.e.*, Plaintiff's mental impairments and limitations.
[4]Plaintiff testified and Dr. Haggenjos also noted that he has treated Plaintiff his entire life.  (R. at 93, 1209.)

production levels expected by most employers; behave predictably, reliably, and in an emotionally stable manner; and tolerate customary work pressures. (R. at 772-74.) Dr. Haggenjos opined that Plaintiff was markedly limited in his abilities to accept instruction from and respond appropriately to criticism from supervisors or superiors; work in coordination with or in proximity to others without distracting them or exhibiting behavioral extremes; process subjective information accurately and to use appropriate judgment; carry through instructions and complete tasks independently; respond appropriately to changes in the work setting; remember locations and workday procedures and instructions; be aware of normal hazards and take necessary precautions; and maintain personal appearance and hygiene. (*Id.*) Dr. Haggenjos concluded that Plaintiff's condition was likely to deteriorate if placed under stress, particularly work stress, because of bipolar disorder and depression. (R. at 774.)

In September 2013, Dr. Haggenjos opined that due to Plaintiff's bi-polar disorder he was incapable of even "low stress" work. (R. at 1034.)

In October 2014, Dr. Haggenjos prepared a narrative affirming his September 2013 opinion. (R. at 1209.)

However, Dr. Haggenjos's treatment notes reflect that Plaintiff was often alert and oriented, was in no apparent distress, and exhibited a normal mood and affect. (R. at 696–97, 699–701, 705–08, 711–17, 722, 726–29, 1039, 1103.)

## B.     Six County, Inc.

Plaintiff presented for mental health treatment in August 2008 due to a court order for a domestic violence charge. (R. at 581–91.) Plaintiff reported distress due to legal issues; his mental status examination was normal. (R. at 580.)

### 1.      Kevin Smyth, LPCC

Plaintiff returned on September 14, 2010, reporting that he is bipolar, "his doc told him he was and has him taking Seroquel and Celexa; he describes irritability, depression, poor sleep." (R. at 563.)  The intake social worker, Kevin Smyth, LPCC felt "perhaps he is bipolar but I suspect it is dysthymia, money and housing and family problems."  (*Id.*)  On mental status exam, Plaintiff exhibited a depressed mood and poor insight and judgment.  (R. at 564–65.)  Plaintiff was assigned a Global Assessment of Functioning ("GAF") score of 60 and he was diagnosed with a mood disorder, NOS; it was suspected that he wanted a diagnosis of bipolar disorder to help his social security disability claim.  (R. at 563.)

When seen for his first counseling session on September 21, 2010, Mr. Smyth found Plaintiff was "visibly irritable" and depressed but he did engage in the session.  (R. at 546.)  Also on September 21, 2010, Mr. Smyth sent a letter to Dr. Haggenjos regarding Plaintiff's psychotropic medication and indicated that it needed adjusted.  (R. at 529.)

When seen by Mr. Smyth on September 28, 2010, Mr. Smyth reported that Plaintiff "doesn't seem to have even a slight interest in changing his ways - he has some anti-social features, and may be going to jail soon—there is a court hearing in October re the domestic violence charge.  If found guilty he will likely go to jail for several months.  Nevertheless I am trying to establish a good rapport here in case he should [begin] showing some insight."  (R. at 547.)  Mr. Smyth noted that Plaintiff was friendly, talkative, slightly manipulative; and was taking the medication prescribed by Dr. Haggenjos and "I will be surprised if they don't help." (*Id.*)  The following month, Mr. Smyth reported that Plaintiff wanted a diagnosis that would

bolster his social security disability case. He did not want to work at improving himself, and reported that he had been looking for work. (R. at 549.)

Mr. Smyth continued to report that Plaintiff was malingering/exaggerating his symptoms to bolster his disability claim. Mr. Smyth noted Plaintiff "did appear to suffer some mood disorder but I fear his hope to bolster his SSI claim obfuscates the matter and makes it hard to discern what is really going on." (R. at 551.) Mr. Smyth continued to treat Plaintiff through April 2011, when he suspended treatment noting Plaintiff was not really interested in changing or engaged in counseling. (R. at 612.)

## 2. Wheaton Wood, M.D.

Dr. Wood performed his initial psychiatric evaluation on December 20, 2010. (R. at 555–58.) Plaintiff reported feeling isolated, helpless, and hopeless. He became a daily marijuana smoker and began experiencing hallucinations starting at age 21 as well as paranoia. (R. at 555.) He described an inability to follow instructions or work and a history of suicide attempts. (R. at 556.) Dr. Wood found Plaintiff to be extremely unpleasant, and made more unpleasant by his illness. Plaintiff stated that he experienced hallucinations when he stopped smoking marijuana. (*Id.*) Dr. Wood diagnosed schizoaffective disorder, bipolar type; and marijuana dependence. (*Id.*) Dr. Wood prescribed Valium and Zyprexa. (R. at 558.)

Dr. Wood saw Plaintiff every 3–4 months for pharmacological management. A mental status examination in March 2011, revealed a depressed mood, a congruent affect, and ongoing hallucinations. Dr. Wood increased the dose of Plaintiff's psychotropic medication. (R. at 569.) In July 2011, Plaintiff presented with a moderately depressed mood, a depressed affect, and somewhat slowed mentation. Plaintiff reported that he stopped going to therapy because his

therapist, Mr. Smyth, was "of the opinion that cognitive work was not helpful for him." (R. at 570.) Dr. Wood diagnosed schizoaffective disorder, bipolar type, currently depressed, psychotic. (R. at 571.)

In October 2011, Plaintiff presented with a mildly irritable and depressed mood, a flat affect, and mentation that was restricted, concrete, impoverished, and not spontaneous. His psychotic symptoms, specifically hearing voices, had decreased, but he experienced a recurrence of anger and disorganization. Dr. Wood adjusted his medication. (R. at 684.)

On January 10, 2012, Dr. Wood noted Plaintiff's hallucinations and suicidal thoughts, but also noted that Plaintiff reported that he takes care of his four children and that his medication is "helping a little bit[.]" (R. at 756.) On the same day, Dr. Wood opined that Plaintiff was very ill, but noted that Plaintiff is "maintaining insight and control." (*Id*.)

In April 2012, Plaintiff was in an angry mood, with a flat affect, jumbled mentation and hearing voices, fidgeting and pulling on his fingers upon mention of hospitalization, and fleeting thoughts. Dr. Wood recommended that Plaintiff needed therapy in addition to medication. (R. at 931.)

On May 1, 2012, Plaintiff, while struggling with mental health issues, reported that his medications had helped with his suicidal ideation and violence. (R. at 747.)

In June 2012, Plaintiff reported that he was taking care of his children during the day, which was the high point of his life. However, he felt very angry and Dr. Wood noted that his presentation was "pretty paranoid." (*Id.*) He presented with an angry mood, a congruent affect, and recursive and repetitive mentation, thoughts of revenge, and a risk for suicide, homicide, or violence against others. His medication was continued and Dr. Wood reported that "[u]ntil he

gets therapy, case management and I will fill in the gap. This is a pretty potentially dangerous person. But he is apparently great with his kids. And that is nice." (R. at 770.)

Plaintiff reported on October 16, 2012, that his bad dreams are slightly less intense and that he is able to ignore them. (R. at 800.) On the same day, Plaintiff smiled when recounting activities he shares with each of his daughters and he reported socializing with friends. (*Id.*) On October 22, 2012, Dr. Wood reported that Plaintiff has done "a very good job" of taking care of his four children and Dr. Wood sees no reason why Plaintiff could not have custody of his children as long as Plaintiff "stays in treatment as he is." (R. at 804.) Dr. Wood also reported that Plaintiff has not actively hallucinated; is not suicidal; the frequency of nightmares had decreased by half; and that Plaintiff "is holding it together[.]" (*Id.*)

During his appointment in January 2013, Dr. Woods discussed Ms. Smyth's treatment of Plaintiff and how the rest of the team at the office did not think he could reliably work. (R. at 877.) Dr. Wood recommended a sheltered work environment or partial hospitalization because "he is very afraid of people" and the fear was "crippling him." (*Id.*) However, Dr. Wood noted that he did not feel Plaintiff would be successful. (*Id.*) A mental status examination revealed an angry mood, a flat affect, mixed up mentation and he went from topic to topic and made globalizations, and repetitive, recursive, and focused spontaneous conversation. (R. at 877–78.)

On April 17, 2013, Plaintiff had a flat and anxious affect, and was easily confused with questions. (R. at 859.) The following month, Plaintiff was seen for worsening auditory hallucinations. (R. at 879.) Plaintiff presented as disheveled, had poor hygiene and grooming, and was significantly overweight and had gained 60 pounds during the previous year. (R. at 881.) On mental status examination, Dr. Woods found monotonous speech, impulsivity with

aggressive feelings, auditory hallucinations, blunted, dull, to flat mood and affect, and poor eye contact. (R. at 882, 885.) Dr. Wood assigned Plaintiff's GAF score at 45. (R. at 886.)

On May 30, 2013, Dr. Wood prepared a narrative to Plaintiff's counsel informing them that Mr. Smyth's opinion and globalized judgments of Plaintiff were inaccurate. According to Dr. Wood, Plaintiff "is very ill." Plaintiff's "negative symptoms" are disabling. Plaintiff was taking the medication, Clozaril, known for improving negative symptoms, which he noted had occurred to some extent. Dr. Wood also opined that Plaintiff is not a malingerer and his problems are not induced by illegal drugs even though he sometimes uses them. (R. at 1076.)

In December 2013, Plaintiff was seen for a pharmacologic evaluation with a disheveled appearance, abnormal prosody of speech, circumstantial associations, suicidal ideation, limited insight, impaired attention span and distractibility, a blunted affect, and a depressed and sad mood. (R. at 1133–35.) Dr. Wood maintained Plaintiff's medication. (R. at 1136.)

Dr. Wood completed a Psychiatric/Psychological Impairment Questionnaire on January 6, 2014. (R. at 1078–85.) Dr. Wood listed Plaintiff's diagnosis as schizoaffective disorder with a GAF score of 45. (R. at 1078.) Plaintiff's prognosis was poor despite Plaintiff having a "pretty good" response to Clozapine. Dr. Wood noted Plaintiff may have to stop the medication because of metabolic issues which would precipitate a relapse. (*Id.*) Clinical findings included sleep disturbance, mood disturbance, hallucinations, paranoia or inappropriate suspiciousness, difficulty thinking or concentrating, suicidal ideation, oddities of thought, perception, speech, or behavior, perceptual disturbance, catatonia or grossly disorganized behavior, social withdrawal or isolation, blunt, flat, or inappropriate affect, and hostility and irritability. (R. at 1079.) Dr. Wood cited to the results of several psychiatric diagnostic studies to support his diagnosis. (*Id.*)

13

Plaintiff's primary symptoms were paranoid delusions, slowed thinking with poor understanding, and aggression and hostility.  (R. at 1080.)  Dr. Wood opined that Plaintiff was markedly limited in the ability to sustain ordinary routine with supervision; work in coordination with or proximity to others without being distracted by them; complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and set realistic goals or make plans independently.  Plaintiff was found to be moderately limited in the ability to carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance; make simple work related decisions; interact appropriately with the general public; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (R. at 1081–83.) Dr. Wood opined that Plaintiff is not a malingerer and had good and bad days. (R. at 1084.)  He concluded that Plaintiff was likely to be absent from work more than three times a month.  (R. at 1085.)

### 3.      Melissa Johnson, MSW, LSW/Amy Hubbard, LPCC

Plaintiff was seen for a Mental Health Assessment by Ms. Johnson on August 6, 2012. (R. at 759–66.)  Plaintiff stated that he was not doing well and described hallucinations, suicidal ideation, homicidal ideation, violent dreams fluctuating more recently, and violent mood swings and anger outbursts.  (R. at 759.)  Ms. Johnson reported that he appeared depressed, sad, and exhibited a flat affect.  (R. at 762.)  Plaintiff's diagnosis remained as schizoaffective disorder with a GAF score of  45.  (R. at 765.)

Plaintiff was seen by Ms. Johnson on September 10, 2012.  (R. at 802.)  He stated that he was very angry and described an increase in the severity and frequency of his dreams and suicidal/homicidal ideations.  (*Id.*)  When next seen by Ms. Johnson on September 28, 2012, Plaintiff was less agitated than his previous session, but continued to describe increased auditory hallucinations.  (R. at 801.)

Plaintiff continued to see Ms. Johnson and another counselor, Amy Hubbard, LPCC through December 30, 2013.  (R. at 799–800, 905–29, and 1121–32.)  One particular instance in August 2013, Ms. Hubbard ended the session early.  She noted Plaintiff was "slightly put off."  Plaintiff was "groggy and slurry, and not talking."  (R. at 929.)

### 4.     Roger Balogh, M.D.

Dr. Balogh evaluated Plaintiff on July 16, 2014.  (R. at 1147–54.)  Plaintiff presented with a history of schizoaffective disorder, reporting that he had been feeling depressed and described chronic thoughts/voices telling him to kill himself and others for years, as well as disturbed sleep and chronic paranoia.  (R. at 1147.)  On mental status examination, Plaintiff exhibited soft speech, loose associations, impaired abstract thinking, homicidal and suicidal ideation, auditory hallucinations, limited insight, limited knowledge of current events, a blunted, flat affect, and a depressed and sad mood.  (R. at 1150–51.)  Dr. Balogh adjusted his psychotropic medication.  (R. at 1152.)

When seen three months later, on September 10, 2014, Plaintiff reported that he had not noticed any improvement with Bupropion and felt like he was raging.  (R. at 1158.)  He continued to experience intermittent psychotic symptoms, as well as chronic suicidal and homicidal thoughts.  (*Id.*)  Mental status examination revealed loose associations, impaired

abstract thinking, limited insight, impaired remote memory, limited knowledge of current events, and a blunted and flattened mood and affect. (R. at 1161–62.) Dr. Balogh discontinued Bupropion. (R. at 1163.)

Dr. Balogh completed a Mental Impairment Questionnaire on November 5, 2014. (R. at 1212–16.) Dr. Balogh reported that Plaintiff is not a malingerer. (*Id.*) He listed clinical signs including depressed mood, persistent or generalized anxiety, a blunt, constricted, irritable, flat, and labile affect, feelings of guilt or worthlessness, hostility or irritability, homicidal ideation, suicidal ideation, difficulty thinking or concentrating, easy distractibility, loss of intellectual ability, poor recent and remote memory, paranoia/suspiciousness, vigilance and scanning, anhedonia/pervasive loss of interests, decreased energy, psychomotor retardation, slowed speech, social withdrawal or isolation, auditory and tactile hallucinations, loosening of associations, and excessive sleep. (R. at 1213.) Plaintiff's primary symptoms were ongoing hallucinations, especially when in stores and in public, and anxiety and paranoia when outside of his home. (R. at 1214.) According to Dr. Balogh Plaintiff experienced episodes of deterioration or decompensation in work or work like settings because of a paranoia. (*Id.*)

As to Plaintiff's degree of limitation, Dr. Balogh found that Plaintiff had marked limitations in his ability to understand, remember, and carry out detailed instructions; carry out simple, one to two step instructions; maintain attention and concentration for extended periods; work in coordination with or near others without being distracted by them; complete a workday without interruptions from psychological symptoms; interact appropriately with the public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them; maintain socially appropriate behavior; respond

16

appropriately to workplace changes; and set realistic goals.  (R. at 1215.)  Plaintiff had moderate-to-marked limitations in his ability to perform activities within a schedule and consistently be punctual; sustain ordinary routine without supervision; perform at a consistent pace without rest periods of unreasonable length or frequency; ask simple questions or request assistance; be aware of hazards and take appropriate precautions; travel to unfamiliar places or use public transportation; and make plans independently.  (*Id.*)  Dr. Balogh opined that the symptoms and limitations detailed in the questionnaire were present in 2010 when Plaintiff began psychiatric treatment at the facility.  (R. at 1216.)  Plaintiff was likely to be absent from work, on average, more than three times per month.  (*Id.*)

C.      **Charles Loomis, Ph.D.**

        Dr. Loomis examined Plaintiff on behalf of the Perry County Department of Job and Family Services on September 6, 2011.  (R. at 621–27.)  Plaintiff reported that he was unable to work because of severe mood swings.  (R. at 622.)  He indicated that he generally got along with his coworkers at his past jobs, but he had difficulty interacting with supervisors because he did not like authority.  He had been fired from his most recent job because he yelled at his foreman.  (R. at 623.)  On mental status examination, Dr. Loomis noted Plaintiff was guarded and reserved, with a flat monotone voice, and a restricted affect and depressed mood.  (R. at 624.)  Plaintiff described crying episodes, often being irritable and easily agitated, anxiety, auditory hallucinations, and a "pervasive" distrust of others and resentment towards persons in positions of authority.  (R. at 624-25.)  After presenting questions assessing Plaintiff's cognitive functioning, Dr. Loomis concluded that Plaintiff's concentration and attention to task, immediate and  delayed  memory functions and computational abilities were within average limits.  (R. at

625.) Dr. Loomis noted that Plaintiff possessed a good fund of general information, modest reasoning and practical problem solving abilities. (*Id*.) Dr. Loomis estimated that Plaintiff's functional intelligence was in the average range. (*Id*.) Dr. Loomis diagnosed schizoaffective disorder, bipolar type, and paranoid personality disorder. (*Id*.) He assigned Plaintiff a GAF score of 50. (R. at 626.) Dr. Loomis opined that Plaintiff appeared to be limited in the capacity for sustained participation in competitive work and that exposure to workplace authority would likely increase his psychiatric interpretations and elevate the risk of acting out. (R. at 627.)

Dr. Loomis also completed a Mental Residual Functional Capacity Assessment in which he opined that Plaintiff was markedly limited in his ability to accept instructions and respond appropriately to criticism from supervisors. Dr. Loomis found Plaintiff was moderately limited in the ability to work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and respond appropriately to changes in the work setting. (R. at 621.)

**D. State agency review[5]**

In November 2011, Caroline Lewin, Ph.D., a state-agency psychologist, reviewed the medical record upon reconsideration and assessed Plaintiff's mental condition. (R. at 187–96.)

---

[5]The Court did not summarize the initial review of the record performed in July 2011 because the ALJ did not credit this opinion and Plaintiff does not contend that the weight assigned to this opinion is an issue. (SOE at 24.)

Dr. Lewin based her evaluation on the medically determinable impairments of Schizophrenia and Other Psychotic Disorders.  (R. at 192.)  Dr. Lewin found that Plaintiff had moderate restrictions of activities of daily living; marked difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation.  (*Id.*)  Dr. Lewin also found that the evidence did not establish the presence of the "Part C" criteria.  (R. at 193.)  Dr. Lewin noted that Plaintiff's allegations were only partially credible, finding that his statements of limitations are not consistent with the evidence in file.  The medical records show a higher level of functioning.  (*Id.*)  She also gave no weight to both Dr. Loomis's and Dr. Haggenjos's opinions finding them "not completely consistent with [the medical evidence] and prior information in file, including CDIU [Cooperative Disability Investigations Unit] investigation."  (R. at 194.)  Dr. Lewin concluded that Plaintiff was limited to no direct contact with the public.  He appears capable of limited superficial interaction with others, with direct over-the-shoulder supervision.  Plaintiff also appears capable of work in a relatively static environment, where there are no strict time or production demands.  (R. at 194–95.)

## IV.    ADMINISTRATIVE DECISION

On November 25, 2014, the ALJ issued his decision.  (R. at 20–43.)  Plaintiff met the insured status requirements through December 31, 2011.  At step one of the sequential evaluation process,[6] the ALJ found that Plaintiff had not engaged in substantially gainful activity since

---

[6] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §416.920(a)(4).  Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

January 1, 2009, the alleged onset date.  (R. at 23.)  The ALJ found that Plaintiff had the severe impairments of (1) a schizoaffective disorder, (2) a bipolar disorder, (3) refractory chondromalacia of both knees, status post bilateral arthroscopic surgeries; (4) status post a remote right shoulder arthroscopy; and (5) obesity.  (*Id.*)  The ALJ determined that Plaintiff's irritable bowel syndrome, gastroesophageal reflux disease, and a history of substance abuse are not severe impairments.  (R. at 24.)  He further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 25.)  At step four of the sequential process, the ALJ set forth Plaintiff's RFC as follows:

> After careful consideration of the entire record, the [ALJ] finds that the claimant has the residual functional capacity to perform light work, as that term is defined in 20 CFR 404.1567(b) and 416.967(b), with the exception that he stand and/or walk for a half hour at a time and for four hours total. The claimant can occasionally perform bilateral overhead reaching, balance, stoop, crouch, and climb ramps and stairs. He is precluded from kneeling, crawling, and climbing ladders, ropes, and scaffolding. The claimant retains the capacity to understand, remember, and carry out simple instructions and make judgments on all simple work. He retains the capacity to respond appropriately to usual work situations and make changes in a routine work setting that is repetitive from day to day with few and expected changes. The claimant is precluded from activities involving arbitration, negotiation, confrontation, directing the work of others, and being

---

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

responsible for the safety of others. He is precluded from working in a team setting or in tandem with coworkers. He is precluded from contact with the public and from high pressure and/or over the shoulder supervision. He retains the capacity to respond appropriately to coworkers and supervisors on trivial matters, defined as the dispensing and sharing of factual information not likely to generate an adversarial setting.

(R. at 28.) In reaching this determination, the ALJ assigned "partial" weight to treating psychiatrist, Dr. Wood's January 6, 2014 opinion, but "no" weight to his October 22, 2012 opinion; "little" weight to treating psychiatrist, Dr. Balogh's opinion; "little" and "no" weight to treating physician Dr. Haggenjos opinions; "minimal" weight to examining psychologist, Dr. Loomis; and "partial" weight to the November 2011 review of the record by Dr. Lewin. (R. at 36–39.)

Relying on the VE's testimony, the ALJ concluded that Plaintiff can perform jobs that exist in significant numbers in the national economy. (R. at 41–42.) He therefore concluded that Plaintiff was not disabled under the Social Security Act. (R at 43.)

## V. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. at 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"

*Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI.    ANALYSIS

In his Statement of Errors, Plaintiff advances three contentions of error. Plaintiff first argues that the ALJ failed to properly weigh the medical opinion evidence. Plaintiff next contends that the ALJ failed to properly evaluate his credibility. Finally, Plaintiff argues that the ALJ relied on flawed VE testimony.

## A.  ALJ's Consideration of the Medical Opinion Evidence

According to Plaintiff, the ALJ should have accorded more weight to the opinions of treating physician Dr. Haggenjos; treating psychiatrist, Dr. Wood; and treating psychiatrist, Dr. Balogh.  Plaintiff also argues that the ALJ improperly relied on non-examining sources.  (SOE at 19–26.)  The Commissioner counters that substantial evidence supports the ALJ's assessment and that he reasonably evaluated the medical opinion evidence.  (Opposition at 6–15.)

The ALJ generally gives deference to the opinions of a treating source "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical filings alone . . ."  20 C.F.R. § 416.927(c)(2);  *Blakley*, 581 F.3d at 408.  If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight."  20 C.F.R. § 404.1527(c)(2).

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements.  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors-namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source-in determining what weight to give the opinion.

*Id*.  Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion."  20 C.F.R. § 416.927(c)(2).  Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550 (6th Cir. 2010) (internal quotation omitted).  The Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied."  *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999).  The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.  *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45.  Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the claimant as disabled."  *Germany-Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242).  There is no requirement, however, that the ALJ "expressly" consider each of the *Wilson* factors within the written decision.  *See Tilley v. Comm'r of Soc. Sec.*, 394 F. App'x 216, 222 (6th Cir. 2010) (indicating that, under *Blakley* and the good reason rule, an ALJ is not required to explicitly address all of the six factors within 20 C.F.R. § 404.1527(c)(2) for weighing medical opinion evidence within the written decision); *Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) ("Neither the ALJ nor the Council is required to discuss each piece of data in its opinion, so long as they consider the evidence as a whole and reach a reasoned conclusion.").

Finally, the Commissioner reserves the power to decide certain issues, such as a claimant's residual functional capacity. 20 C.F.R. § 404.1527(d). Although the ALJ will consider opinions of treating physicians "on the nature and severity of your impairment(s)," opinions on issues reserved to the Commissioner are generally not entitled to special significance. 20 C.F.R. § 404.1527(d); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

### 1.     The Opinion of Dr. Haggenjos

The ALJ considered Dr. Haggenjos's opinion dated August 21, 2012, that Plaintiff had marked to extreme limitation of functioning in social interaction, sustained concentration and persistence, and adaption, but assigned it "no weight," reasoning as follows:

> First, Dr. Haggenjos' opinion rests on an assessment of an impairment that is outside his area of expertise as a general practitioner. Second, the opinion expressed by Dr. Haggenjos is quite conclusory, providing very little explanation of the information he relied upon in forming the opinion. Finally, Dr. Haggenjos' opinion is inconsistent with the other credible opinion evidence of record, which is consistent with the objectively established signs and symptoms contained in the record (see, e.g., the physical examination findings set forth in Exhibit 13F).

(R. at 38.)

The Court finds that the ALJ provided good reasons for according no weight to Dr. Haggenjos's opinion that Plaintiff had marked to extreme limitation of functioning in social interaction, sustained concentration and persistence, and adaption. First, the ALJ properly considered that Dr. Haggenjos is not a mental health expert. *See* 20 C.F.R. § 416.927(c)(5) ("Specialization. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."). Moreover, as the ALJ pointed out, Dr. Haggenjos's opinion that Plaintiff had marked to extreme limitation of functioning in social interaction, sustained concentration and

persistence, and adaption was conclusory and provided little detail of the information underlying this opinion. (R. at 772–775.) Notably, Dr. Haggenjos's extreme assessments were not supported by his mental status examination findings or his own treatment notes. *See* 20 C.F.R. § 404.1527(c)(3) (identifying "supportability" as a relevant consideration). For example, Dr. Haggenjos's treatment notes reflect that Plaintiff was often alert and oriented, was in no apparent distress, and exhibited a normal mood and affect. (R. at 696–97, 699–701, 705–08, 711–17, 722, 726–29, 1039, 1103.)

In addition, the ALJ properly noted that Dr. Haggenjos's opinion of Plaintiff's extreme limitations was inconsistent with other record evidence. For instance, although Dr. Haggenjos assessed that Plaintiff had extreme limitations in social interaction, the record reflects—and the ALJ noted—that Plaintiff was able to meet and marry his wife; generate a family that includes four children; and spend a large part of his time since the alleged onset date serving as the primary caregiver to his four young daughters with no documented problems; got along well with his parents, with whom he lives; and met a new woman in May 2013. (R. at 34–35, 553–54, 556, 572, 756, 759, 770, 800, 803–04, 923.) The ALJ further noted that Plaintiff reported in October 2012, that he was getting out and spending time with friends. (R. at 35, 800.)

As discussed in more detail below, the ALJ properly considered evidence reflecting that specific stressful events, *i.e.*, Plaintiff's wife's infidelity and the end of Plaintiff's marriage, aggravated Plaintiff's mental symptoms and that his mental symptoms improved with treatment. 20 CFR 404.1529(c)(3)(iii), (v) (listing factors relevant to symptoms, including aggravating factors and treatment received). (R. at 35, 799.) Substantial evidence therefore supports the ALJ's consideration and weighing of Dr. Haggenjos's opinion. *See Blakley*, 581 F.3d at 406

("'[I]t is an error to give an opinion controlling weight simply because it is the opinion of a treating source if . . . it is inconsistent [] with other substantial evidence in the case record.'" (quoting SSR 96–2p, 1996 WL 374188, at *2 (July 2, 1996)); *cf. Schmiedebusch v. Comm'r of Soc. Sec.*, 536 F. App'x 637, 649 (6th Cir. 2013) ("The ALJ retains a 'zone of choice' in deciding whether to credit conflicting evidence.").

In challenging the ALJ's rejection of Dr. Haggenjos's extreme limitations, Plaintiff insists that this doctor "provided appropriate medical support" for his opinion. (SOE at 21.) However, as noted by the ALJ and as discussed above, Dr. Haggenjos's assessment of the severe limitations provided little detail of the information underlying his opinion and his own treatment notes did not support such severe limitations. (R. at 38, 696–97, 699–701, 705–08, 711–17, 722, 726–29, 772–775, 1039, 1103.)

Plaintiff goes on to identify record evidence that reflects examinations that revealed, a depressed or angry mood, depressed or flat affect, auditory hallucinations, and periodic issues with mentation. (SOE at 21–22.) The ALJ expressly considered these issues (R. at 35), but noted that the medical evidence from 2011 through December 2013 also often showed unremarkable findings in concentration, attention, memory, and thought processes. (R. at 27, 35.) This evidence, along with other evidence showing moderate mental and social functioning limitations, good mental status testing, and improvement with treatment, provides substantial support to the ALJ's treatment of Dr. Haggenjos's opinion. Accordingly, this Court defers to the ALJ's finding "'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley*, 581 F.3d at 406 (internal citations omitted).

For all of these reasons, the ALJ did not err in his consideration and weighing of Dr. Haggenjos's opinion dated August 21, 2012, that Plaintiff had marked to extreme limitation of functioning in social interaction, sustained concentration and persistence, and adaption.

## 2. The Opinions of Dr. Wood

The ALJ considered Dr. Wood's opinion dated January 6, 2014, that Plaintiff had moderate to marked limitation in his capacity to sustain concentration and persistence and in his social interaction, and marked to extreme limitation in his adaption, but assigned it "partial weight," reasoning as follows:

> Dr. Wood's opinion is accepted insofar as it is consistent with the findings reached in this decision. However, Dr. Wood's opinion cannot be accorded any greater weight because a careful review of Dr. Wood's own treatment records documents that the claimant admitted to experiencing control of his auditory hallucinations, a diminished frequency of nightmares, and overall improvement in his irritability and mood to the extent that he is able to function sufficiently to care for his four children, share a residence and interact with his parents on a regular basis, and date (Exhibits 11F, 12F, 15F, 18F, 21F, 23F, 26F, 28F, 30F, 38F, 39F, and 44F).

(R. at 39.)

The ALJ provided good reasons for according partial weight to Dr. Wood's opinion that Plaintiff had moderate to marked limitation in his capacity to sustain concentration and persistence and in his social interaction, and marked to extreme limitation in his adaption. The ALJ reasonably concluded that the severity of the assessed limitations is not supported by Dr. Wood's treatment records or evidence from the record. *See* 20 C.F.R. § 404.1527(c)(3) (identifying "supportability" as a relevant consideration). Although the record reflects Plaintiff's complaints of suicidal ideation, anger, depression, and hallucinations, Plaintiff's mental symptoms improved with treatment. For example, on January 10, 2012, Dr. Wood noted

Plaintiff's hallucinations and suicidal thoughts, he also noted that Plaintiff reported that he takes care of his four children and that his medication is "helping a little bit[.]" (R. at 756.) On the same day, Dr. Wood opined that Plaintiff was very ill, but noted that Plaintiff is "maintaining insight and control." (*Id.*) On May 1, 2012, Plaintiff, while struggling with mental health issues, reported that his medications have helped with his suicidal ideation and violence. (R. at 747.) Plaintiff reported on October 16, 2012, that his bad dreams are slightly less intense and that he is able to ignore them. (R. at 800.) On the same day, Plaintiff smiled when recounting activities he shares with each of his daughters and he reported socializing with friends. (*Id.*) On October 22, 2012, Dr. Wood reported that Plaintiff has done "a very good job" of taking care of his four children and Dr. Wood sees no reason why Plaintiff could not have custody of his children as long as Plaintiff "stays in treatment as he is." (R. at 804.) Dr. Wood also reported that Plaintiff has not actively hallucinated; is not suicidal; the frequency of nightmares had decreased by half; and that Plaintiff "is holding it together[.]" (*Id.*) The record reflects continued improvement through 2013. (R. at 855, 861, 923, 927, 1128–29.) Dr. Loomis's psychological evaluation dated September 2011, and treatment notes also reflected many instances of good attention and concentration and little problems with his memory, thought processes, and fund of knowledge. (R. at 564–65, 577–78, 580, 625, 806, 873, 875, 882, 885, 1134–35, 1142–43.)

In sum, the ALJ did not err in his consideration and weighing of Dr. Wood's opinion.

### 3. The Opinions of Dr. Balogh

Dr. Balogh opined on November 5, 2014, that Plaintiff had, *inter alia*, marked limitations in some areas and moderate to marked limitations in other areas. (R. at 1215.) The ALJ considered Dr. Balogh's opinion, but assigned it "little weight," reasoning as follows:

First, the record fails to explain what treating relationship, if any, Dr. Balogh has with the claimant. Second, Dr. Balogh failed to identify the type of significant clinically established mental status abnormalities that one would expect if the claimant did in fact have this level of moderate to marked limitation of functioning (see specifically Exhibit 47F, page 5), and the [sic] Dr. Balogh did not specifically address this weakness in his opinion, nor did he provide any psychiatric treatment notes of documented mental status examination findings that would corroborate the severity of his conclusions. Third, it appears that Dr. Balogh relied quite heavily on the subjective reports of symptoms and limitations provided by the claimant, and that he also uncritically accepted as true all of what the claimant reported. This conclusion is supported by the objective evidence of record, as previously discussed above, establishing that the claimant has experienced improvement in the frequency of any auditory hallucinations and nightmares, and that he has experienced an overall improvement in his irritability and mood, to the extent that he is able to function sufficiently to care for his four children, share a residence and interact with his parents on a regular basis, and date (Exhibits 11F, 12F, 15F, 18F, 21F, 23F, 26F, 28F, 30F, 38F, 39F, and 44F).

(R. at 39.)

The ALJ provided good reasons for according little weight to Dr. Balogh's opinions dated November 5, 2014. *See* 20 C.F.R. § 416.927(c) (citing supportability and consistency of the opinion with the record as a whole). Substantial evidence supports the ALJ's conclusions concerning the consistency and supportability of Dr. Balogh's opinion. As discussed above with respect to Dr. Wood's opinion, the record evidence reflects Plaintiff's improvement with treatment and many mental status examinations with instances of good attention and concentration and little problems with his memory, thought processes, and fund of knowledge. Plaintiff's daily activities detailed above are also inconsistent with the severe limitations Dr. Balogh opined. Moreover, for the reasons discussed below related to Plaintiff's credibility, the ALJ properly accorded little weight to Dr. Balogh's opinion when this doctor relied on and accepted uncritically as true Plaintiff's subjective reports of symptoms and limitations. *See Ferguson v. Comm'r of Soc. Sec.,* 628 F.3d 269, 273-74 (6th Cir. 2010) (finding that the ALJ did

not err in rejecting medical opinion premised upon claimant's subjective complaints that were

not supported by objective medical evidence); *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 877

(6th Cir. 2007) (holding that physicians' opinions are not due much weight when premised upon

on reports made by a patient that the ALJ found to be incredible).

In sum, the Undersigned finds that the ALJ did not err in his consideration and weighing

of Dr. Balogh's opinion dated November 5, 2014.

### 4. The Opinion of Dr. Loomis

The ALJ considered the opinion of Dr. Loomis dated September 6, 2011, that Plaintiff is

"unemployable" and his GAF rating of Plaintiff of 50, but assigned it "minimal weight,"

reasoning as follows:

> First, Dr. Loomis' opinion is inconsistent with the remainder of his opinion, that
> the claimant had mild to moderate limitation of functioning in the area of
> understanding and memory and adaption. Moreover, Dr. Loomis again assessed
> that the claimant had only mild to moderate limitation of functioning in all areas
> of social interaction, with the one exception of a marked limitation in his ability to
> accept instructions and respond appropriately to critic [sic] from supervisors.
> Such generally mild to moderate limitations are wholly inconsistent with Dr.
> Loomis' overall conclusion that the claimant was "unemployable." Second, the
> conclusions that a claimant is "unemployable" addresses an area reserved to the
> Commissioner under Social Security Ruling 96-5p and 20 CPR § 404.1527(e) and
> § 416.927(e), which state that the final responsibility for determining if a claimant
> is "disabled" or "unable to work" is reserved for the Commissioner.

(R. at 38.)

The ALJ provided good reasons for according little weight to Dr. Loomis's opinion that

Plaintiff is "unemployable" and the GAF rating of Plaintiff of 50. *See* 20 C.F.R. § 416.927(c)

(citing supportability and consistency of the opinion with the record as a whole). Substantial

evidence supports the ALJ's conclusions concerning the consistency and supportability of Dr.

Loomis's opinion. As the ALJ points out, Dr. Loomis's conclusion that Plaintiff is

"unemployable" is inconsistent with Dr. Loomis's assessments that Plaintiff had mild to moderate limitations in the areas of understanding and memory and adaption and in all areas of social interaction, with the one exception of a marked limitation. In addition, the ALJ properly noted that Plaintiff was "unemployable" is not a medical opinion, but rather, an issue reserved for the Commissioner. 20 C.F.R. § 404.1527(d). When a treating physician submits an opinion on an issue reserved to the Commissioner, the opinion is "not entitled to any particular weight," and the ALJ "need only explain the consideration" it was given. *Johnson v. Comm'r of Soc. Sec.*, 535 F. App'x 498, 505 (6th Cir. 2013) (internal quotation marks omitted).

For these reasons, the ALJ did not err in his consideration and weighing of Dr. Loomis's opinion dated September 6, 2011, that Plaintiff is "unemployable" and his GAF rating of Plaintiff of 50.

### 5.    The Opinion of Dr. Lewin

Plaintiff also challenges the ALJ's reliance upon the opinion of Dr. Lewin, the state-agency medical consultant, contending first that the ALJ gave "greater weight" to her opinion than to opinions from treating or examining sources. (SOE at 23–24.)[7] However, the record reflects that the ALJ accorded Dr. Lewin's opinion "partial weight," explaining as follows:

> This assessment is assigned only partial weight. With regard to the State Agency opinion concerning the claimant's mental residual functional capacity, this opinion is accepted insofar as it is consistent with the findings reached in this decision. However, this opinion cannot be accorded any great weight, insofar as it might be construed as suggesting a greater degree of functional limitation in the claimant's capacity to maintain social functioning. The record fails to support any greater degree of limitation relating to the claimant's social functioning because the evidence clearly documents that the claimant retains the ability to

---

[7] As noted earlier, Plaintiff acknowledges that the ALJ did not credit the state-agency consultant who opined that Plaintiff did not have any mental impairments and therefore does not challenge the ALJ's finding in this regard. (SOE at 24.)

care for his four children, share a residence and interact with his parents on a regular basis, and date (Exhibits 1lF, 12F, 15F, 18F, 21F, 23F, 26F, 28F, 30F, 38F, 39F, and 44F).

(R. at 36.)

As an initial matter, the Commissioner correctly points out that in giving "partial weight" to Dr. Lewin's opinion, the ALJ gave the same, not greater, weight to her opinion that he accorded to Dr. Wood's opinion. (R. at 36, 39.)

In addition, substantial evidence supports the ALJ's decision to award partial weight to Dr. Lewin's opinion. The ALJ properly noted that Dr. Lewin, as a state agency consultant, is an expert in disability evaluation. *See* 20 C.F.R. § 416.927(e)(2)(i) ("State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation.") In weighing her opinion, the ALJ also properly considered that the evidence, as discussed in detail above, did not support all of the social functioning limitations identified in Dr. Lewin's opinion, including that Plaintiff was able to care for his four daughters, share a residence and interact with his parents, and date. (R. at 36.)

Plaintiff apparently challenges the ALJ's consideration of Plaintiff's abilities to perform some activities of daily living by arguing that these abilities do not necessarily establish that Plaintiff is capable of working full time, citing *Rogers v. Comm'r of Soc. Sec* ., 486 F.3d 234, 248–49 (6th Cir. 2007). (SOE at 25.) Plaintiff specifically relies on the portion of *Rogers* in which the Sixth Circuit stated that "somewhat minimal daily functions are not comparable to typical work activities." (*Id*. (citations and internal quotation marks omitted.)) However, the

"minimal daily functions" in *Rogers* included the ability "to drive, clean her apartment, care for two dogs, do laundry, read, do stretching exercises, and watch the news." *Rogers* 486 F.3d at 248. Conversely, here, the ALJ properly considered that Plaintiff was capable of caring for his four young children, cohabitate successfully with his parents, and date. In other words, Plaintiff has not shown how his ability to perform these daily life activities were in any way minimal like the abilities presented in *Rogers*. Moreover, as discussed below, the ALJ properly concluded that there was no credible evidence that Plaintiff does not have the ability to perform the basic mental demands of work. (R. at 36.) Accordingly, "'even if there is substantial evidence in the record that would have supported an opposite conclusion[,]'" *Blakley*, 581 F.3d at 406 (internal citations omitted), the Court defers to the ALJ's decision.

In short, the ALJ properly weighed and assessed the medical opinions of record, all of which were supported by substantial evidence. Plaintiff's first contention of error is **OVERRULED**.

**B.     Credibility Assessment**

"The ALJ's assessment of credibility is entitled to great weight and deference, since he [or she] had the opportunity to observe the witness's demeanor." *Infantado v. Astrue*, 263 F. App'x 469, 475 (6th Cir. 2008) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)); *Sullenger v. Comm'r of Soc. Sec.*, 255 F. App'x 988, 995 (6th Cir. 2007) (declining to disturb the ALJ's credibility determination, stating that: "[w]e will not try the case anew, resolve conflicts in the evidence, or decide questions of credibility" (citation omitted)). This deference extends to an ALJ's credibility determinations "with respect to [a claimant's] subjective complaints." *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 652 (6th Cir. 2009)

(quoting *Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987)).  Despite this deference, "an ALJ's assessment of a claimant's credibility must be supported by substantial evidence."  *Walters*, 127 F.3d at 531.  Furthermore, the ALJ's decision on credibility must be "based on a consideration of the entire record."  *Rogers*, 486 F.3d at 247 (internal quotation omitted).  An ALJ's explanation of his or her credibility decision "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  *Id.* at 248.

"Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence."  *Walters*, 127 F.3d at 531.  In addition, the Regulations list a variety of factors an ALJ must consider in evaluating the severity of symptoms, including a claimant's daily activities; the effectiveness of medication; and treatment other than medication.  20 C.F.R. § 404.1529(c)(3); SSR 16-3P, 2016 WL 1119029 (March 16, 2016); *but see Storey v. Comm'r of Soc. Sec.*, No. 98-1628, 1999 WL 282700, at *3 (6th Cir. Apr. 27, 1999) ("[T]he fact that [the ALJ] did not include a factor-by-factor discussion [in his credibility assessment] does not render his analysis invalid.").

In evaluating Plaintiff's credibility with respect to his subjective claims, the ALJ must determine whether there is an underlying medically determinable physical impairment that could reasonably be expected to produce the claimant's symptoms.  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007).  Second, if the ALJ finds that such impairment exists, then he must evaluate the intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities.  *Kalmbach v. Comm'r or Soc. Sec.*, 409 F. App'x 852, 863

(6th Cir. 2011). Pursuant to SSR 16-3p, the ALJ must evaluate seven factors in determining

credibility:

> In addition to using all the evidence to evaluate the intensity, persistence, and limiting effects of an individual's symptoms, we will also use the factors set forth in 20 CFR 404.1529(c)(3) and 416(c)(3). These factors include:
>
> 1. The individual's daily activities;
> 2. The location, duration, frequency, and intensity of pain other symptoms;
> 3. Factors that precipitate and aggravate the symptoms;
> 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
> 5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
> 6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
> 7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 16-3P, 2016 WL 1119029 (March 16, 2016).

SSR 16-3p tasks the ALJ with explaining his credibility determination with sufficient

specificity as "to make clear to the individual and to any subsequent reviewers the weight the

adjudicator gave to the individual's statements and the reasons for that weight." *Brothers v.*

*Berryhill*, Case No. 5:16-cv-01942, 2017 WL 29125, at *11 (N.D. Ohio June 22, 2017) (citing

*Rogers*, 486 F.3d at 248).

The ALJ noted that while Plaintiff complained that his mental conditions, which Plaintiff

reported caused hallucinations, suicidal ideation, and anger, made it difficult for Plaintiff to be

around other people, "the record contains evidence calling the claimant's alleged symptoms into

question." (R. at 29.) The ALJ further noted that although Plaintiff's "medically determinable

impairments could reasonably be expected to cause the alleged symptoms[,]" Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this opinion." (R. at 30.) In his credibility analysis, the ALJ considered Plaintiff's RFC, contrasting Plaintiff's alleged symptoms with the objective medical evidence. (R. at 27, 29–30, 33–35.) For example, the ALJ noted that the record reflected, from 2008 through 2014, that Plaintiff had an estimated functional intelligence in the normal range and that he exhibited good attention, concentration, with no problems with his recent or remote memory, thought processes, judgment, insight, or overall fund of knowledge, even though Plaintiff reported suicidal ideation and hallucinations. (R. at 27, 564–65, 567, 577–78, 580, 625, 762–63, 804, 806, 1134–35, 1142–43, 1151.) The ALJ further considered that Plaintiff experienced no episodes of decompensation. (R. at 27, 204.) The ALJ properly relied on these objective medical findings when assessing Plaintiff's credibility. *See* 20 C.F.R. § 404.1529(c)(2) (objective medical findings are useful in assessing the intensity and persistence of a claimant's symptoms).

Plaintiff complains that it was unclear why the ALJ determined that Plaintiff's stress over his marriage undermined Plaintiff's credibility regarding his alleged symptoms. (SOE at 28.) However, it was reasonable for the ALJ to consider evidence reflecting that specific stressful events, *i.e.*, Plaintiff's wife's infidelity and the end of Plaintiff's marriage, aggravated Plaintiff's mental symptoms and that his mental symptoms improved with treatment. 20 CFR 404.1529(c)(3)(iii), (v) (listing factors relevant to symptoms, including aggravating factors and treatment received).

Finally, the ALJ also reasonably discounted Plaintiff's allegations based upon the record evidence reflecting his activities of daily living and conflicts between his testimony and other record evidence. *See* 20 C.F.R. § 404.1529(c)(3)(i) (daily activities may be useful to assess nature and severity of claimant's symptoms); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004) ("The administrative law judge justifiably considered [the claimant's] ability to conduct daily life activities in the face of his claim of disabling pain."); *Walters*, 127 F.3d at 532 ("An ALJ may also consider household and social activities engaged in by the claimant in evaluating a claimant's assertions of pain or ailments."); *id.* at 531 (discounting credibility appropriate where contradiction between testimony and other evidence). Although Plaintiff complained that his anger and difficulty being around other people impaired his ability to engage in work-related activities, the ALJ found that the record undermined Plaintiff's claims in this regard. (R. at 34–35.) Specifically, the ALJ noted Plaintiff's ability to meet and marry his wife; generate a family that includes four children; and spend a large part of his time since the alleged onset date serving as the primary caregiver to his four young daughters with no documented problems. (R. at 34–35.) The ALJ further considered repeated references in the record that Plaintiff got along well with his parents, with whom he resides, and with his four daughters, noting further that Plaintiff's treating psychiatrist assessed in October 2012, that Plaintiff retained mental functioning to have shared and/or full custody of his children, which is well after Plaintiff's alleged onset date of January 1, 2009. (R. at 35.) The ALJ considered that Plaintiff admitted that his primary stressor was his divorce and that Plaintiff had gone to jail "one time in the remote past for a domestic violence [incident.]" (R. at 35.) The ALJ further noted that Plaintiff reported in October 2012, that he was getting out and spending time with friends. (*Id.*)

In May 2013, Plaintiff reported meeting a new woman, and in July 2013, Plaintiff reported that he "'did fine' from a psychological standpoint when he had a woman in his life." (*Id.*)

For all of these reasons, the ALJ properly concluded that "the evidence fails to establish a direct link between the claimant's alleged psychological symptoms and his poor work history" (R. at 34) and that there was no credible evidence that Plaintiff does not have the ability to perform the basic mental demands of work. (R. at 36.)

In sum, the ALJ's assessment of Plaintiff's credibility was based on consideration of the entire record and is supported by substantial evidence and is therefore entitled to "great weight and deference." *Infantado*, 263 Fed.Appx. at 475. Accordingly, applying the applicable deferential standard of review, the ALJ's credibility determination was not erroneous. Plaintiff's second contention of error is therefore **OVERRULED**.

## C.      The ALJ's Reliance on VE Testimony

Finally, Plaintiff contends that the ALJ improperly relied on flawed VE testimony because the ALJ's hypothetical did not adequately account for moderate difficulties in concentration, persistence, or pace, when determining whether Plaintiff's impairments met or equaled a listing. (SOE at 29–31 (citing *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504 (6th Cir. 2010)).

"In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments." *Ealy*, 594 F.3d at 516. "Hypothetical questions, however, need only incorporate those limitations which the [administrative law judge] has accepted as credible." *Parks v. Soc. Sec. Admin*., 413

F. App'x 856, 865 (6th Cir. 2010) (citing *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d

1230, 1235 (6th Cir. 1993)).

Here, the ALJ determined that Plaintiff had moderate limitations in concentration,

persistence or pace, reasoning as follows:

> With regard to concentration, persistence or pace, the claimant has moderate difficulties. On February 9, 2011, the claimant reported that he was able to concentrate sufficiently to care for his four young children; assist his grandmother, mother, and father with activities of daily living; prepare simple meals; watch television; play video games; do laundry; and complete household chores (Exhibit 3E; see also Exhibits 13Fand 16F). Such activities demonstrate, at a minimum, the ability to understand and follow simple instructions and maintain attention and concentration to perform at least simple tasks. In this context, it is noted that the claimant was able to understand and follow the hearing proceedings both closely and fully without any observable difficulty and to respond to questions in an appropriate manner. Moreover, a careful review of the treatment records provided Six County, Inc., reflect that the claimant was generally described has having good attention, concentration, with no problems with his recent or remote memory, thought processes, judgment, insight, or overall fund of knowledge (Exhibits 1lF, 12F, 15F, 18F, 21F, 23F, 26F, 28F, 30F, 38F, 39F, and 44F). In fact, on September 6, 2011, Dr. Loomis reported that the claimant's concentration, attention, immediate and delayed memory, and computational abilities were all within the average range. Dr. Loomis reported that the claimant had a good fund of general information, a modest reasoning ability, and practical problem solving skills. The claimant's functional intelligence was estimated to fall within the average range. Mr. Loomis assessed that the claimant retained the capacity to manage his personal affairs and participate in treatment (Exhibit 16F). Furthermore, the reviewing psychologist with the State Agency opined that the claimant had only moderate difficulties in maintaining concentration, persistence, or pace (Exhibit 6A). There is no credible or compelling evidence since the date of that determination to support a greater restriction.

(R. at 27.) The ALJ's RFC determination similarly provides in relevant part as follows:

> The claimant retains the capacity to understand, remember, and carry out simple instructions and make judgments on all simple work. He retains the capacity to respond appropriately to usual work situations and make changes in a routine work setting that is repetitive from day to day with few and expected changes. The claimant is precluded from activities involving arbitration, negotiation, confrontation, directing the work of others, and being responsible for the safety of

others. He is precluded from working in a team setting or in tandem with coworkers. He is precluded from contact with the public and from high pressure and/or over the shoulder supervision. He retains the capacity to respond appropriately to coworkers and supervisors on trivial matters, defined as the dispensing and sharing of factual information not likely to generate an adversarial setting.

(R. at 28.)

In challenging the ALJ's reliance on the hypothetical posed to the VE, Plaintiff does not cite to the record. (SOE at 29.) However, from Plaintiff's summary, the Court understands Plaintiff to be referring to the following hypothetical:

Please assume a hypothetical individual vocationally situated as is the claimant. This hypothetical individual could perform all functions of light work, except occasionally balance; occasionally climb ramps and stairs, stoop, crouch; no kneeling or crawling, or climbing ladders, ropes, or scaffolds. This individual can stand or walk four hours in an eight-hour workday, 30 minutes continuously. Further, he can occasionally reach overhead bilaterally. *This individual can understand, carry out, and remember simple instructions, and make judgements on simple work*; *respond appropriately to—respond appropriately to usual work situations— . . . and changes in a routine work setting that is repetitive from day to day with few unexpected changes. . . . The individual should be precluded from high production quotas, such as piece work or assembly line work, strict time requirements*, arbitration, negotiation, confrontation, directing the work of, or being responsible for, the safety of others, and involves no more—no more than -- no more interaction with supervisors or coworkers on trivial matters . . . Involves no more than interaction with supervisors, coworkers, and trivial matters. . . . No direct work with the general public and no working in team or tandems with coworkers.

(R. at 99–100 (emphasis added).)

Plaintiff argues that the ALJ's hypothetical (and the RFC) did not account for moderate restrictions in concentration, persistence, or pace. (SOE at 29–31.) Plaintiff specifically contends that *Ealy* found a similar hypothetical defective where that ALJ offered a "stream-lined hypothetical" that limited the claimant to "simple, repetitive tasks and instructions in non-public

settings" and omitted the claimant's speed and pace-based limitations, including that claimant's limitation of two-hour work segments. (*Id.* at 30.)

Contrary to Plaintiff's suggestion, *Ealy* "does not stand for the proposition that a finding that a claimant is limited to 'simple work' is somehow legally deficient." *Goodrich v. Comm'r of Soc. Sec.*, No. 1:15-CV-1002, 2017 WL 1130023, at *4 (W.D. Mich. Mar. 27, 2017). Indeed, "numerous post-*Ealy* decisions have affirmed in cases in which the ALJ has addressed a moderate impairment in concentration, persistence, and pace by including a limitation to 'simple repetitive tasks,' clearly rejecting any bright line rule that such limitations are always inadequate." *Dunn v. Comm'r of Soc. Sec.*, 2016 WL 4194131, at *4 (S.D. Ohio July 15, 2016), *adopted and aff'd by* 2016 WL 4179586 (S.D. Ohio Aug. 8, 2016); *see also Clayton v. Astrue*, No. 1:12–cv–79, 2013 WL 427407, at *7 (S.D. Ohio Feb. 1, 2013) (collecting cases).

Notably, *Ealy* does not mandate the inclusion of limitations beyond those posed to the VE based upon a finding of moderate impairment in concentration, persistence, or pace where the record does not otherwise support additional limitations. On this point, *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426 (6th Cir. 2014), is instructive. The *Smith-Johnson* court analyzed this argument as follows:

> Smith–Johnson's first challenge concerns her concentration, persistence, or pace. She relies on *Ealy*, 594 F.3d 504, to support her argument that more specific limitations should have been included in the hypothetical to the VE. Yet, *Ealy* is distinguishable from this case. In *Ealy*, the claimant's doctor limited him to "simple, repetitive tasks [for] [two-hour] segments over an eight-hour day where speed was not critical." *Ealy*, 594 F.3d at 516. In that RFC assessment, however, the ALJ included only a limitation to "simple repetitive tasks and instructions in nonpublic work settings." *Id.* That RFC finding was included in the hypothetical to the VE. *Id.* This court held that the RFC assessment and the hypothetical did not adequately reflect the claimant's limitations because it truncated the doctor's specific restrictions. *Id.*

Here, the limitation to simple, routine, and repetitive tasks adequately conveys Smith–Johnson's moderately-limited ability "to maintain attention and concentration for extended periods." Unlike in *Ealy*, Dr. Kriauciunas did not place any concrete functional limitations on her abilities to maintain attention, concentration, or pace when performing simple, repetitive, or routine tasks. Instead, Dr. Kriauciunas plainly determined that Smith–Johnson could perform simple tasks on a "sustained basis," even considering her moderate limitations in maintaining concentration and persistence for "extended periods." In other words, the limitation to simple tasks portrays the tasks that she can perform without being affected by her moderate limitations. The ALJ thus did not fail to include a restriction on her ability to maintain concentration, persistence, or pace while performing simple tasks, and he further reduced the required attention and concentration by restricting her to routine and repetitive tasks.

579 F. App'x at 436–37. Here, after a thorough explanation, the ALJ found that Plaintiff had moderate limitations in concentration, persistence or pace. (R. at 27.) Plaintiff does not contend, or cite to anything in the record, suggesting or establishing that he had greater or more restrictions in these areas as present in *Ealy*. (SOE at 29–31.) While the ALJ did not state Plaintiff's moderate limitations in the RFC and hypothetical exactly as he had at step 3 of the sequential analysis, the ALJ nevertheless considered all of the relevant evidence, gave reasons for his findings, and properly articulately Plaintiff's limitations in concentration, persistence, or pace. *See Goodrich*, 2017 WL 1130023, at *4; *Dunn*, 2016 WL 4194131, at *4; *Clayton*, 2013 WL 427407, at *7.

In sum, the ALJ properly articulated the hypothetical to the VE and properly relied on the VE's testimony in addition to sufficiently articulated his bases for his RFC determination. Plaintiff's third contention of error is therefore **OVERRULED**.

## VII. CONCLUSION

Accordingly, the Court **OVERRULES** Plaintiff's Statement of Errors and **AFFIRMS** the Commissioner's decision. The Clerk is **DIRECTED** to enter judgment in favor of Defendant.

**IT IS SO ORDERED.**


Date:   September 13, 2017                         _____s/Algenon L. Marbley_____
                                                                    Algenon L. Marbley
                                                                    United States District Judge